## RUSSELL *vs.* LASHER and others.

Where creditors claiming adversely to an assignment made by a debtor in trust for the benefit of his creditors, and whose demands existed prior to the execution thereof, file a bill to avoid the assignment on the ground of fraud, they need not make any of the other creditors of the assignor parties to the suit. Under such circumstances it is enough to bring the assignor and assignee before the court.

Where a suit is brought, by a creditor, to set aside an assignment, of that nature, if the assignee acts in good faith, and a decree is fairly obtained declaring the assignment fraudulent and void, creditors of the assigned estate, not brought before the court, are bound by the decree; and it is as conclusive upon them as upon the parties to the suit.

The principle upon which creditors, provided for in an assignment, are bound by a decree obtained against the assignee, is, that, as beneficiaries of the trust, they are to be regarded as represented by their trustee, and therefore in privity with him.

But such creditors are only bound by the *bona fide* acts of their representative, the assignee. To make a decree obtained against the assignee binding upon

Russell *v.* Lasher.

the creditors, the suit must have been fairly conducted, and the decree fairly obtained.

If the assignee cannot successfully defend a suit brought by a creditor, for the purpose of setting aside the assignment, and therefore omits to put in a defence; or, believing that such defence would prove fruitless, consents that the plaintiff's bill may be taken as confessed, creditors claiming under the assignment are equally bound by a decree thus obtained, as if the suit had been contested.

The object of the statute respecting fraudulent conveyances, &c. was to provide a remedy against actual fraud in transactions which, if conducted in good faith and without any fraudulent intent, are to be upheld as legal, and to facilitate the detection of fraud when it does exist, by throwing the *onus probandi* upon the persons claiming under such transaction; and requiring them to prove that it was not only *in good faith*, for *good and valuable consideration*, but also *such circumstances*, agreeable with the ordinary course of business and fair dealing, as shall rebut the presumption of fraud. *Per* HARRIS, J.

IN EQUITY. William Adams of West Camp, in the county of Ulster, having been engaged in mercantile business, and having become insolvent, on the *second* day of July, 1840, made an assignment of all his property and effects to his brother Thomas Adams, in trust for the benefit of his creditors. The property assigned consisted of his interest in a store of goods in which Adams was a partner with one Crawford, worth about $1000, a quantity of stone worth from one to two thousand dollars, about $1000 worth of lumber, a sloop, and debts to the amount of eight or ten thousand dollars, of which two or three thousand dollars were deemed collectable. The assignment, after providing for the payment of an account due to Van Vleck and Pruyn, next directed the payment of all paper endorsed by the plaintiff for the assignor; also certain notes therein specified which had been endorsed or secured by Jeremiah Eligh, deceased, either as endorser or joint maker, and then the payment of other debts.

James Freeland and others, creditors of William Adams, having recovered a judgment against him for $1819, on the 12th day of May, 1842, filed a bill to set aside the assignment, upon an allegation that the same had been made to hinder and defraud creditors. Shortly after the bill was filed, it was arranged between the plaintiff in that suit and the defendants Thomas Adams and William Adams, and Mrs. Eligh, the

Russell *v.* Lasher.

mother-in-law of William Adams, that the bill should be taken as confessed and a receiver of the assigned property be appointed, and that the plaintiffs should assign their interest in the suit to Mrs. Eligh for the sum of $800. This arrangement was carried into effect. On the 5th of July, 1842, an order for the appointment of a receiver was entered, and subsequently Isaac Pruyn, Esq. was appointed such receiver. Mr. Pruyn was the law-partner of Mr. Van Vleck, the counsel of Adams.

On the 14th of May, 1842, Peter Lasher, George C. Lasher, Bastian C. Lasher, Jacob Lasher, and David Lasher, recovered against William Adams, as survivor of Jeremiah Eligh, deceased, a judgment for $559,90. On the same day George C. Lasher recovered another judgment against the same defendant for $569,74; and on the 30th day of March, 1842, Bastian C. Lasher, Jacob Lasher and David Lasher recovered against Adams another judgment for $1083,34. Executions having been issued upon these judgments, the assigned property of Adams was levied upon by the sheriff of Ulster, and advertised to be sold on the 11th of August, 1842. The sale was prevented by an injunction obtained by Mr. Pruyn the receiver. On the same day, after the service of the injunction, an agreement was entered into between Mrs. Eligh and the plaintiffs in these three executions, whereby, after reciting the recovery of the judgment and the filing of the bill by Freeland and others, and the assignment to Mrs. Eligh of that demand and the recovery of the three judgments by the Lashers, upon which they were entitled to file creditors' bills, it was agreed by Mrs. Eligh that in case such bill should be filed, the same should take precedence to the bill filed by Freeland and others, and that the Lashers' judgments should be first paid out of the moneys which should come into the hands of the receiver. The object of Adams and Mrs. Eligh, in consenting to this arrangement, was to protect the estate of Jeremiah Eligh, which was liable for the payment of the Lasher judgments.

On the 23d of August, 1842, the Lashers filed their bill against William Adams, Thomas Adams, Mrs. Eligh and Mr. Pruyn, the receiver, setting forth the recovery of their judgments, the

return of their executions unsatisfied, the execution of the assignment by William Adams to Thomas Adams, and charging that it was executed for the purpose of defrauding creditors. The bill also stated that the notes upon which the plaintiff's judgment had been obtained, were signed by Jeremiah Eligh, and provided for in the second class of creditors mentioned in the assignment. It further stated that the notes upon which Jeremiah Russell was liable as endorser or otherwise, had been paid, and that Russell was discharged from his liability. It further charged that the assignment had not been accompanied by an actual and bona fide change of possession of the property assigned, but that the property had continued in the possession and under the control of William Adams, and he had since sold and disposed of some part of it; that the only use that had been made of the assignment was to cover and protect the property from creditors. It further stated that Pruyn had, on the 3d of August, 1842, been appointed receiver under an order made in the suit in which Freeland and others were plaintiffs, and in pursuance of the order for his appointment, the assigned property had been conveyed to him by William and Thomas Adams. The bill then set forth the stipulation with Mrs. Eligh to give the plaintiffs' judgments the preference, and prayed for satisfaction of the judgments. The defendants in that bill signed a stipulation consenting that an order might be entered to take the bill as confessed against them, and that Mr. Pruyn be appointed receiver in that suit. The plaintiffs also signed a stipulation that no personal claim should be made for costs against any of the defendants except William Adams. On the 27th of August, 1844, the cause was brought to a hearing, Mr. Van Vleck appearing as counsel for the defendants Thomas Adams, Christina Eligh and Isaac Pruyn; and a decree was made declaring the assignment fraudulent and void, and directing the payment of the plaintiffs' judgments out of the property and effects in the receiver's hands. On the 2d of October, 1844, the chancellor made an order directing the receiver to pay over to the Lashers $1410,40, the balance in his hands as receiver, after deducting his fees and disbursements.

Russell v. Lasher.

On the 12th of October, 1844, the bill in this cause was filed. The Lashers, together with William Adams, Thomas Adams, and Mrs. Eligh, were made defendants. The bill stated that the plaintiff was the holder of three notes signed by William Adams as principal, and Jeremiah Eligh as surety, amounting to $2295,75, of which he became the owner prior to the execution of the assignment in July, 1840. It further stated that, although these notes were preferred by the terms of the assignment, the plaintiff was ignorant of the fact until the 12th of September, 1844. The bill then proceeded to set forth the other facts above stated, and charged that the proceedings in the suit in which the Lashers were plaintiffs were taken in bad faith, and by collusion between the Lashers and the defendants William Adams, Thomas Adams, and Mrs. Eligh, for the purpose of depriving the plaintiff and the other preferred creditors mentioned in the assignment, of the benefit to which they were entitled under the assignment. The same charge was made in the bill in respect to the proceedings in the suit in which James Freeland and others were plaintiffs. The plaintiff also insisted that the assignment from William Adams to Thomas Adams was made in good faith, and claimed that he was entitled to his ratable proportion of the moneys in the hands of the receiver. The Lashers put in their answer, in which they admitted the facts substantially as stated in the bill, but denied all collusion and fraud, and insisted that the assignment from William Adams to Thomas Adams was fraudulent and void as against creditors. They averred and charged that the assignment was not accompanied with a bona fide and actual change of possession of the property assigned—that at least a considerable part of the property remained in the possession or under the control of William Adams, and that it was partly sold and disposed of by him; that Thomas Adams, the assignee, was wholly and notoriously irresponsible and insolvent. The bill was taken as confessed by the other defendants. Mrs. Eligh subsequently died, and the plaintiffs' solicitor gave notice of his election to proceed with the suit without reviving against her legal representatives. A replication to the answer of the Lash-

ers having been put in, several witnesses were examined, and among others William Adams, who had obtained a discharge in bankruptcy. Their testimony is sufficiently noticed in the opinion of the court. The cause was brought to a hearing at a special term, upon pleadings and proofs.

*John Van Vleck*, for the plaintiffs.

*H. Hogeboom*, for the defendants the Lashers.

*By the Court*, HARRIS, J. It was not necessary that the Lashers, in filing their bill to avoid the assignment executed by William Adams to his brother, should make any of the creditors of William Adams parties to the suit. Their demands were prior to the execution of the assignment, and they claimed adversely to it. Under such circumstances it is enough to bring the assignor and assignee before the court for the purpose of avoiding the trust as fraudulent and void. No rule in equity pleading is perhaps better settled than this. (*Rogers* v. *Rogers*, 3 *Paige*, 379. *Wakeman* v. *Grover*, 4 *Id.* 33, *and cases there cited. Mitford's Pl.* 176. *Story's Eq. Pl.* §§ 215, 216.)

The next question relates to the effect of the decree, declaring the assignment void, upon creditors, who are not made parties. To what extent is the plaintiff bound by the decree against the assignee? Is the decree conclusive upon him—as much so, as if he had been joined with the assignee in the suit? Or is it merely prima facie proof against the plaintiff, which he may overcome by showing that the decree was obtained by fraud, or is otherwise unjust? Or is the plaintiff to be regarded as a stranger to the decree, at liberty, unembarrassed by it, to litigate anew the same matters involved in it? These are questions not without their difficulty. This difficulty arises from the departure, in this instance, from the general rule in equity pleading, that all persons having any legal or equitable interest, to be affected by the decree, are necessary parties to the bill. It seems inequitable that any one, having such an interest, should be bound by a decree without being permitted

Russell *v.* Lasher.

to assert his rights. The general rule is that a judgment or decree is not evidence against one who is a stranger to the proceeding, and who had no opportunity to examine witnesses, or to defend himself, or appeal. In this case the plaintiff had no such opportunity to resist the decree declaring the assignment for his benefit void. When he sought to oppose the order which was to give the plaintiffs in that decree the benefit of its provisions, he was told that, not being a party to the proceedings, he could not be heard. Upon what principle then is he to be held concluded by the decree without having been allowed the power of defending his rights? It can only be upon the ground that, as the beneficiary of the trust, he is to be regarded as represented by his trustee, and therefore in privity with him. And in this respect the case seems to be kindred to that class of cases in which third persons, whose interests may be consequentially affected by the decree, are bound by it, though not parties to the suit. Thus if a bill were filed against an administrator or executor to establish a claim against his estate, other creditors might be essentially affected by the decree. Yet, while they are bound by the decree, it is not necessary to make them parties. The same is true in respect to all suits against an executor or administrator. There are other persons whose interest is necessarily to be affected by the result, either as creditors, legatees, or distributees. Yet these are always deemed to be so far represented before the court as to bind their interests. "Perhaps," says Justice Story, (*Eq. Pl.* § 141,) "the true explanation of this doctrine is, that, in cases of this sort, courts of equity proceed upon the analogy of the common law, which treats the personal representative of the deceased debtor or testator as the regular representative of all the persons interested in the personal assets and bound by *his bona fide acts*, so far as third persons are concerned." But, though such persons are treated as, in some sort, privy to the decree, they are only bound by the *bona fide acts* of their representative. To make it binding upon them, the suit must have been fairly conducted, and the decree fairly obtained. This view of the doctrine involved, seems pretty clearly to define the relation in which the

Russell *v.* Lasher.

plaintiff stands to the decree declaring the assignment void. If, in that transaction, the assignee acted in good faith and the decree was fairly obtained, the plaintiff as a creditor of the assigned estate is bound by it. On the one hand, the decree is not conclusive upon him, as it is upon the parties to it. They would not be allowed to impeach it, even for fraud in the manner of obtaining it. Their only mode of relief against the decree would be by appeal, or by an application to the court pronouncing it, to vacate it. This cannot be done by the plaintiff; but when the decree is set up against him he may be heard, when he charges and offers to prove that it was fraudulently obtained. On the other hand, he is not a stranger to the decree. It may be used as evidence against him, and, until he can show that it was improperly obtained, it is as conclusive upon him as upon the parties before the court when it was pronounced.

This brings us to the merits of the controversy; and the question is, was there any unfairness in the manner of obtaining the decree which declared the assignment void and directed the application of the proceeds of the assigned property to the payment of the Lashers' debt? The alleged fraud consists in the consent of the assignee that the Lashers' bill to set aside his trust, should be taken as confessed by him, and thus surrendering his right to protect the assignment. If the assignment were valid, and by a proper defence, the Lashers' attempt to avoid it might have been defeated, I should have no hesitation in pronouncing a decree obtained under such circumstances, collusive and void as against the plaintiff. On the other hand, if no defence could have been successfully interposed to save the assignment, the decree ought not to be held to be the less valid, because the assignee omitted to interpose a groundless defence. The assignee may be chargeable upon a bill framed with a different aspect, for neglect of duty in the execution of the trusts of the assignment; but if when the Lashers filed their bill, the misconduct of the assignee in reference to his trusts, had been such that, however severely it might have been resisted, they would have been entitled to a decree avoiding the assignment, they should not be deprived of the benefit

of that decree because the assignee chose to admit their right to it, by stipulating that the bill be taken as confessed against him. If the Lashers had colluded with the assignee in his previous conduct, so as to enable them subsequently to avoid the assignment, then, indeed, though another creditor might have taken advantage of the misconduct of the assignee, they could not. Their decree might then have been avoided for collusion. But it is not pretended that there was any collusion between the Lashers and the assignee prior to the time when the injunction was served on the day the property was to have been sold on their executions.

What was the state of things at that time, in reference to the assignment? If then it might have been defended—if the assignee had acted in good faith, for the benefit of those he represented, the decree, obtained as it was through the consent of the assignee, ought not to be held to be binding upon the plaintiff—but if it appears that the Lashers were then entitled, upon the established principles which govern courts in such cases, to have the assignment set aside, the decree is as binding upon the plaintiff, as if pronounced at the end of a severe and protracted litigation. I do not mean to say that a decree obtained by default, where a meritorious defence existed, might not have been available to the Lashers. All I mean to say is, that I think the evidence of collusion in this case sufficient to avoid the decree, if the assignee could have made a successful defence to the suit.

The assignment was executed on the 2d of July, 1840. The assignee was the brother of the assignor. He had for many years been in his employ as master of a sloop running between West Camp and New-York. According to William Adams' testimony, he was worth six or eight hundred dollars. He owed William at the time of the assignment $150, which, for any thing that appears in the case, is yet unpaid. These circumstances—his doubtful capacity to close up such an estate judiciously, inferrible from his previous employment—his limited responsibility—his relationship to the assignor—his indebtedness to the assigned estate—are calculated, at least, to awaken jeal-

ousy as to the manner of executing the trusts of the assignment. The assigned property consisted of the sloop of which the assignee was master; a quantity of stone, worth, as William Adams says, from one to two thousand dollars; about $1000 worth of lumber; the interest of William Adams in a store of goods in which he was a partner with Lemuel Crawford; and outstanding debts to the amount of about $10,000, of which some two or three thousand dollars were collectible. The goods in the store at the time of the assignment amounted to about $1000. After the assignment Thomas Adams continued to run the sloop as before; a part of the stone were carried to market by him and sold; some were sold by William Adams on the dock. The lumber seems to have been principally disposed of by William Adams. Several bills of sale given by him in his own name are produced. About $1000 was collected upon the debts assigned, of which William Adams says he received from five to eight hundred dollars. The moneys received were applied by William Adams to the payment of his notes upon which the plaintiff was endorser. William Adams continued to sell goods out of the store, to collect bills and receive payments, after the assignment, the same as before. Goods to the amount of two or three hundred dollars were taken from the store and used in his family. He was charged with these goods, in his account with the store. In short, although more than two years elapsed between the execution of the assignment and the appointment of a receiver, yet I cannot perceive, from the evidence, that Thomas Adams ever assumed any control over the property, as assignee. On the contrary, the business seems to have been continued after the assignment, both by William and Thomas Adams, in the same manner it had been conducted before. William Adams seems to have had the entire management and control of affairs. There was no apparent change either of ownership or possession. I cannot say, from the evidence in the case, that Thomas Adams ever performed any single act by virtue of his office as trustee, that he would not have performed had no assignment been made. The most that can be said in support of the assignee's possession

Russell *v.* Lasher.

is that he was constructively in possession. This is not enough. The statute commands me to presume that the assignment was fraudulent and void, unless I can find from the facts in the case that it was "accompanied by an immediate delivery and was followed by an *actual* and continued change of possession" of the assigned property. (2 *R. S.* 70, § 5, *2d ed.*) This I cannot find. Such was not the case. The statute further requires me to hold the fact, that there was no such delivery and change of possession, to be not only *presumptive* but *conclusive* evidence of fraud, until satisfied by those who would sustain the assignment that it was made in good faith and without any fraudulent intent. The object of this statute, in respect to the construction of which learned judges have so widely differed, is well expressed, and, I may add, in my judgment, its true construction is given, by Senator Hopkins, in *Smith* v. *Acker*, (23 *Wend.* 659,) where he says, "To my mind it is evident upon the face of the statute itself, that the object was to provide a remedy against actual fraud in transactions, which, if conducted in good faith and without any fraudulent intent, are to be upheld as legal, and to facilitate the detection of fraud when it does exist, by throwing the *onus probandi* upon the persons claiming under such transaction—and requiring them to prove that it was *not only in good faith, for a good and valuable consideration, but also such circumstances* of publicity, reasonableness as to amount, time, value and quantity of property, difficulty or inconvenience of removal, advantages of allowing it to remain, or *other circumstances agreeable with the ordinary course of business and fair dealing*, as shall rebut the presumption of fraud." (*See also Connah* v. *Sedgwick*, 1 *Barb. Sup. Court Rep.* 210.) Guided by this plain rule, can I say that there are facts and circumstances proved in support of the assignment sufficient to overcome the presumption of fraud which the statute attaches to the transaction? So far from this does the evidence in the case seem to me, that I can scarcely see how the conduct of the assignor and the assignee, in respect to the assigned property, is reconcilable with a single purpose honestly to devote it to the objects expressed in the

---

assignment. If, therefore, the question were before me upon the bill filed by the Lashers to set aside the assignment, and the facts had appeared as they do in this case, I could not have hesitated to pronounce the assignment void. The counsel for the plaintiff himself, or, at any rate, his partner, Mr. Pruyn, must have so considered it, when he consented that the Lashers' bill should be taken as confessed. This conclusion seems necessary to vindicate his integrity in giving such consent.

If, then, the assignee could not have successfully defended the Lashers' suit, so as to prevent a decree avoiding the assignment, are the plaintiffs in that suit to be deprived of the benefit of their decree because the assignee omitted to resist it, or even because the assignee, advised that such a defence would prove fruitless, consented that the bill might be taken as confessed? I think not. The assignee is undoubtedly liable to the creditors for whom he undertook to act as trustee, for gross neglect of duty, but the Lashers are entitled to retain the decree to which the prior conduct of the assignee, upon well settled rules of law, had entitled them. The bill must be dismissed; and, though inclined to do so, I can see no just ground upon which I can excuse the plaintiff from the payment of costs. He must therefore be charged with the costs also.

